IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 17-502 |
| MICHAEL SHORE,<br>    a/k/a "TheOtakuJeweler2" | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO BAR APPLICATION OF THE MANDATORY SENTENCE
AND GUIDELINE RANGE**

**I.    INTRODUCTION**

Defendant Michael Shore moves this Court to preclude imposition of the mandatory minimum sentence of incarceration for his violations of 18 U.S.C. § 2251, arguing that it violates the Eight Amendment's prohibition against cruel and unusual punishment. For the reasons outlined below, the Government moves for denial of the defendant's Motion.

**II.    PROCEDURAL BACKGROUND**

On October 25, 2017, defendant Michael Shore entered an open plea of guilty to the indictment, which charged him in Counts One, Three, Five, Seven, and Nine with use of an interstate commerce facility to entice a minor, and attempt to entice a minor, to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2422(b); in Count Two, Four, and Six, with manufacture and attempted manufacture of child pornography, in violation of 18 U.S.C. § 2251(a) and (e); in Count Eight with distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and in Count Ten with possession of child pornography, in violation of 18 U.S.C.

1

§ 2252(a)(4)(B), all arising from the defendant's sexual abuse and exploitation of four minor victims on multiple occasions, his directing the minor girls to photograph and record themselves in sexually explicit positions, and his collection of thousands of sexually explicit images and videos of prepubescent girls.

Prior to the entry of his guilty plea, among the legal issues reviewed by the Court were the statutory maximum and mandatory minimum terms of incarceration for each of the criminal offenses in the indictment, as well as the total maximum punishment: life imprisonment, with a mandatory minimum 15-year prison term. The defendant acknowledged he understood the consequences of his plea, and reiterated his desire to plead guilty. The Court then accepted his plea as knowingly, intelligently, and voluntarily entered.

He now moves this Court to preclude imposition of the 15-year mandatory minimum term[1], arguing that it amounts to "cruel and unusual punishment." He also requests this Court to depart and vary downward from the applicable sentencing Guideline range.

## III. FACTUAL BACKGROUND[2]

On May 13, 2017 the parents of 12-year old Victim #1 reported to the St. Mary's County Sheriff's Office in Maryland that an adult male had been in contact with their 12-year old daughter via Facebook, and that the messages he sent to her were sexually graphic. The mother of the victim advised that on May 12, 2017 she saw her daughter speaking with someone on her

---

1 The defendant does not challenge the 10-year mandatory minimum sentences associated with Counts One, Three, Five, Seven, and Nine, nor does he challenge the 5-year mandatory minimum term required in Count Eight. The only mandatory minimums at issue in this Motion are the 15-year terms associated with his conviction on Counts Two, Four, and Six.

2 The facts are taken from the Government's Change of Plea Memorandum, to which the defendant stipulated at the Change of Plea hearing.

cell phone, and saw the name of the person as Michael Shore. She then did online research on this name on Facebook and located a Michael Shore residing in Richboro, Pennsylvania, and saw that her daughter was one of Shore's Facebook friends. The next day, the mother sent Shore a private Facebook message, advising him that the victim was only 12 years old and in the 6th grade, and that she was a troubled child. She also directed him not to engage with her daughter. Shore responded that he did not know she was only 12 years old, but he was only her friend and was trying to help and support her. Shore told her mother that he had no intention of doing anything to her except to be her friend. Investigation later revealed that at the time that Shore was communicating with this 12-year old girl, he was 33 years of age.

Later that same day, after the victim's mother advised Shore that her daughter was just 12 years old, the mother again checked the victim's Facebook account and saw that Shore was now communicating with the victim through private, direct messages. The messages were sexual in nature, with Shore repeatedly asking the victim for nude pictures of herself and telling her that he wanted to have sex with her. The victim's parents reported Shore's communications with their daughter to police that same day.

The victim and her mother provided police with Victim #1's Facebook login information and gave consent to retrieve the full Facebook message history between the victim and Shore, and to use the victim's Facebook account during the investigation. A review of the messages revealed Shore added the victim as a Facebook friend on February 25, 2017 and continued to message with the victim until May 13, 2017 (Count One – use of an interstate commerce facility to entice a minor to engage in sexual conduct). They chatted about different comic conventions they went to or were planning to attend. Shore asked the victim her age, and she advised that

she was 15 years old, to which he responded that he was 33 years old. Throughout the messages Shore asked the victim personal questions about her sexuality, inquired whether she was dating anyone, and continuously called her sexy, cute, babe, hot, and told her that he loved her. They exchanged phone numbers with each other and the victim also provided her home address to Shore at his request. Shore told the victim when asking for her home address, "So we could hug, kiss, snuggle, cuddle, and more!!!" and "that will definitely happen this summer when you allow me to come over." Shore also told the victim, "even if my car was in the shop I'd borrow my parent's car to come see you my lover/girlfriend."

On multiple occasions Shore told Victim #1 he wanted to hug and kiss her, and on one occasion told her, "Between you and me, if you'd let me, I'd have sex with you and of course I'd wear a condom." Shore asked for nude pictures of the victim telling her, "I was wondering if someday soon I could see you in just your underwear and nude." Shore and Victim#1 exchanged several pictures of each other via Facebook messages. The victim was not nude in those photos, but in one picture she was wearing a sports bra with a towel or blanket wrapped around her waist. Shore told the victim after receiving one of her pictures, "Omg. So sexy!!!!! You are so gorgeous. I wanna see you so badly and hold you, hug you, and kiss you. I wanna see all of you and I'd love to see you all exposed (if you catch my drift) I hope your not mad that I love you!!!!!!!!!!!" (Count Two – attempted manufacture of child pornography).

Shore continuously talked about sex with this 12-year old child, asked her if she shaved her vagina, and then explained which sex acts he would engage in with her depending upon if she shaved. On May 16, 2017 law enforcement took control of Victim #1's Facebook account, posed as the victim and began to message Shore. Shore told the victim that he had received a

4

message from her mother, and asked if she was really 12 years old. The undercover agent confirmed that she was really 12 years old, and Shore responded, "I am a little turned on that you wanna have sex with me and looking at your sister closer she's actually really cute and pretty. How old is she again." When he was told that her sister was just 9-years old, Shore asked if Victim #1 ever did anything sexual with her, and further asked, "Have you ever made out with your sister cause I think you should." Shore again asked to see pictures of Victim #1, telling her he wanted photos of "you nude in the shower of course or I'd love to hear you fingering yourself till orgasm." (Count Four – attempted manufacture of child pornography). A few days later Shore showed the victim how to turn on "Secret Conversations" in Facebook Messenger, which allows messages to be encrypted, explaining that we "can be more intimate." Conversations between the undercover officer and Shore via Facebook continued through May 30, 2017. (Count Three –use of an interstate commerce facility to attempt to entice a minor).

      Records of the specific IP address that Shore used to communicate with Victim #1 were traced back to his residence in Richboro, PA, and postal and PennDot records also confirmed Shore's residence. A search warrant was then obtained for Shore's home, and on May 31, 2017 the warrant was executed. Shore was home at the time of the execution of the warrant, and after being advised of his Miranda warnings, he waived his Miranda rights and agreed to speak with agents. His statement was audio recorded. In his statement, Shore at first lied to agents and denied engaging in any sexual communications with the 12-year old victim. Upon further questioning, he confessed to communicating online with her, knowing that she was just 12 years old and in the 6th grade. Shore also admitted that he had requested sexually explicit photographs from her, and engaged in sexually graphic communications with her. He advised that he did so

even after he had been warned by her mother that she was just 12 years old. Additionally, Shore admitted to committing other acts of child sexual exploitation, from the time that he was a juvenile until his present age of 34 years.

A review of all of the evidence confiscated as a result of the search warrant revealed child pornography and evidence of child exploitation on multiple pieces of Shore's electronic equipment. All total, there were 2,588 images of child pornography[3]. The children depicted in the images were prepubescent and pubescent children (primarily ages 6 through 12), nude, engaged in sex acts with adults and other children, and in some instances, with themselves. The images also included children depicted in sadistic sex acts, such as being bound with duct tape and forced to have sex with animals. The images were collected by Shore over a period of eight years – from June 24, 2008 through April 16, 2016[4]. (Count Ten – possession of child pornography).

In addition to the search warrant on his home, the FBI also obtained search warrants for Shore's two Facebook accounts. A review of these accounts confirmed Shore's sexual communications with a number of other users who represented themselves to be minor girls. Three additional minor girls were located, interviewed by the FBI, and identified their communications with Shore and the explicit photos that they sent Shore. The crimes against these girls are outlined below.

Victim #2 communicated with defendant Shore over KIK from March 13, 2016 through

---

3 Of the 33 videos in his collection, 23 of them were over 5 minutes in length, and 19 of those 23 were double that length – more than 10 minutes each. The longest video was one hour and 10 minutes.

4 In addition to the thousands of images of child pornography, there were 3,451 more images depicting children nude that did not meet the definition of child pornography, but which were intermingled with Shore's collection of child pornography.

April 17, 2016. (Count Five – use of an interstate commerce facility to entice a minor). She was 14 years old. Shortly after they started chatting Shore told Victim #2 that he would try to travel to Comic Con near her (Charlottes, NC) so that they could have "private time" together. On March 30, 2016 Shore told her that he wanted to hug and kiss her and be "hers." She responded by telling Shore she was doing "something" because she was in a certain mood. Shore asked if she was fingering herself and told her he wished he could see pics of it, watch her, and help. He asked her if she shaved between her legs, and told her he wished he could see her doing it in pics/vids but told her it was "up to her" if she wanted to send the pics/vids. They continued to engage in sexual chat, with Shore also inquiring whether she had ever had sex yet. On April 2, 2016, Shore again told Victim #2 that he would like to see her nude and watch her play with herself. Two days later on April 4, 2016, he told her he wanted to see her, hug her, kiss her, shower with her, and "more" (winky faces). She asked "sex?" and he said yes. She then sent him a topless photo and then another photo of her fully nude. (Count Six – manufacture of child pornography).

Victim #3 lives in Canada and was 16 and 17 years old when she communicated with defendant Shore from February 13, 2016 through May 4, 2017. (Count Seven – use of an interstate commerce facility to entice a minor). In her interview, Victim #3 stated they actually began chatting in 2015 over Facebook and text, but the FB records only show from February 2016 on. From the beginning of their chats in February 2016, Shore told her that he wanted to have sex with her, and asked her for a "full pic of you." Victim #3 responded by sending him a series of pictures of herself clothed. On February 24, 2016, Shore asked for more pictures, asked about Victim #3 having sex with her girlfriend (any fingering, oral, etc.). He also later

7

told her that he would fuck her in the shower.

On July 28, 2016, Victim #3 sent Shore a series of nude pictures of herself. Victim #3 was 17 years old at that time. Shortly thereafter they switched their communications to Victim #3's other online account, but their chats did not resume with any regularity until February of 2017, when Victim #3 sent Shore a clothed photo of herself. Shore responded by saying he missed seeing her nude and watching her play with herself. Their communications stopped on May 4, 2017. During the time that he was communicating with this victim (and the others), Shore was also chatting with a 30-year old adult woman in Chicago. On November 17, 2016, Shore sent this adult female five photos of Victim #3 (one in which she is fully nude, one in her bra and underwear, and three of her clothed). (Count Eight – distribution of child pornography[5]).

Victim #4 was 15 years old when she met Shore at a Comic Con event in Florida on July 1, 2016. Their relationship continued online, but they met in person a number of times as well. Victim #4 lives is Florida with her mother. She considered herself to be Shore's girlfriend, and Shore referred to her the same way. Both admitted that they first had sex over the Christmas holiday in 2016 in Florida at her house when she was 16 years old and Shore was 33 years old. Shore traveled to Florida to stay with her and her mother for a two week vacation. They again had sex in May 2017 when Shore was in Florida for a Comic Con convention.

Although they had a sexual relationship, Victim #4 never sent any explicit photos of

---

5 These photos are significant to Shore's prosecution, because the images he distributed are different than those he received from Victim #3 and retained in his Facebook account, meaning that there are other images that the Government never recovered.

herself because she was taught in school not to send those types of photos online to anyone (Victim #4 has Asperger's Syndrome). However, Shore maintained contact with this teenaged girl over the telephone and by text so that they could "date" and Shore could have sex with her. (Count Nine – use of an interstate communication facility to entice a minor). In his confession to agents after his arrest on the complaint and warrant, Shore maintained that he always believed Victim #4 was 18 years old during their relationship. However, the forensic exam of his cell phone revealed that Shore saved this girl's contact information in his phone, which included her true birthday and year, their "anniversary," and the place and date that they met, all of which clearly shows that she was a minor child during their relationship (and still is a minor). Agents also recovered messages from Shore's cell phone in which he instructed Victim#4 to lie about her age to his friends and to his mother.

## IV. LEGAL ARGUMENT

Defendant Shore challenges the imposition of the 15-year mandatory minimum sentence required for his conviction under 18 U.S.C. § 2251(a) as unconstitutional, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Defendant's challenge to the mandatory minimum lacks merit, is contrary to established precedent, and should be denied.

The Eighth Amendment prohibits "cruel and unusual" punishments. U.S. Const, Amend. VIII. The Supreme Court has clarified, however, that the Eighth Amendment does not contain a requirement of strict proportionality between a crime and sentence. *Ewing v. California*, 538 U.S. 11, 20 (2003) (noting that the Eighth Amendment contains a narrow proportionality principle in non-capital cases); *see also Harmelin v. Michigan*, 501 U.S. 957, 965 (1991);

*Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010). Rather, the Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime at issue, a threshold that is quite high. *Ewing*, 538 U.S. at 30-31.

The Supreme Court has noted further that the "gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003). Thus, successful challenges to the proportionality of a particular sentence in non-capital cases are "exceedingly rare." *Ewing*, 538 U.S. at 30 (Supreme Court upheld 3-Strikes law for a defendant who received 25 years to life imprisonment for theft of 3 golf clubs); *Rummel v. Estelle*, 445 U.S. 263, 265-66, 272 (1980) (life sentence under mandatory 3-Strikes law upheld for a defendant convicted of obtaining $120 under false pretenses).

The Third Circuit has addressed challenges to mandatory minimum sentences and upheld the imposition of such sentences. See *United States v. MacEwan*, 445 F.3d 237, 251 (3d Cir. 2006) (Mandatory minimum sentence for distribution of child pornography pursuant to 18 U.S.C. § 2252A found not to offend the Eight Amendment); *United States v. Chandler*, 395 Fed.Appx. 908, 912 (3d Cir. 2010) (rejecting challenges to imposition of mandatory minimum for crack cocaine conviction, finding no conflict between § 3553 and a mandatory minimum sentence provision); *United States v. Walker*, 473 F.3d 71, 85 (3d Cir.2007) (The Court is prohibited from sentencing a defendant below the statutory mandatory minimum sentence); *Kimbrough v. United States*, 552 U.S. 85, 107 (2007) ("sentencing courts remain bound by the mandatory minimum sentences prescribed in" 21 U.S.C. § 841(b)).

When resolving an Eighth Amendment proportionality challenge to a sentence, this Court "must examine three factors: (1) 'the gravity of the offense and the harshness of the penalty'; (2)

'the sentences imposed on other criminals in the same jurisdiction'; and (3) 'the sentences imposed for commission of the same crime in other jurisdictions.'" *MacEwan*, 445 F.3d at 247. However, in light of the substantial deference owed to the legislature's authority in determining sentences, courts need not consider the final two factors if the first factor has not been met. *MacEwan*, 445 F.3d at 247-48. In this case, regardless of the depth of this Court's inquiry, defendant Shore cannot mount a successful Eighth Amendment challenge.

This Court "must begin by comparing the gravity of the offense and the severity of the sentence." *Graham*, 130 S. Ct. at 2022. This "first proportionality factor acts as a gateway or threshold." *MacEwan*, 445 F.3d 237. As previously indicated, "only in the rare case" in which this inquiry "leads to an inference of gross disproportionality" should this Court proceed to the intra- and interjurisdictional factors. *Harmelin*, 501 U.S. at 1005.

Courts are reluctant to invalidate sentencing schemes under the proportionality principle; because it is inconsistent with the scheme of federalism and the division of powers within the federal government. *Harmelin*, 501 U.S. at 999–1000. The government must have considerable freedom to experiment in matters of criminal policy. *Id.* "Holding a sentencing law unconstitutional involves a rejection of the judgment of a legislature, which may entail rejecting the moral judgment of the community it represents." *Id*. at 1006.

Turning to an examination of the gravity of the Shore's numerous criminal offenses and multiple victims, as compared to the severity of the sentence, no inference of gross disproportionality can be drawn. *MacEwan*, 445 F.3d at 248-49. Child sexual exploitation crimes are undisputedly grave offenses. The Congressional findings underlying § 2251 repeatedly stress that child pornography "is a form of sexual abuse which can result in physical

or psychological harm, or both, to the children involved." *Child Pornography Prevention Act of 1996*, Pub.L. No. 104–208, § 121, 110 Stat. 3009, 3009–26 (1996) (codified as amended at 18 U.S.C. § 2251). Congress found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." *Id*. Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep. No. 108-66; S. Rep. No. 104-358*, in light of the continuing harm to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers." *Id; See also United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998) ("[T]he victimization of the children involved does not end when the pornographer's camera is put away.").

The Third Circuit has also recognized the on the extreme harm to children who are victims of sexual abuse, particularly victims of manufacture of child pornography in 18 U.S.C. § 2251, the same crime committed by defendant Shore on multiple victims in this case:

> "In evaluating the magnitude of the harm caused by child pornography, we defer to the findings made by Congress. The congressional findings underlying § 2251 repeatedly stress that child pornography 'is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved.' Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, § 121, 110 Stat. 3009, 3009–26 (1996) (codified as amended at 18 U.S.C. § 2251). Congress found that 'where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.' *Id.*
>
> Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere 'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.' § 121, 110 Stat. at 3009–27. Furthermore, 'it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation and distribution

12

> of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials. *Id.; see also New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.")."

*MacEwan*, 445 F.3d at 249-50. The physical and mental damage to these child victims – and their families - is life altering. In *United States v. Goff*, 501 F.3d 250, 258-259 (3d Cir. 2007), the Third Circuit recognized the devastating, long-term impact of these offenses on the children who are victimized and abused for the entertainment of an online audience:

> "The briefest of forays into Goff's on line fantasy world gives the lie to his cant about 'solitary' activities and exposes the basic flaw in the District Court's implied conclusion that nothing wrong was going on here except in Goff's mind. According to the pre-sentence report, one of the images is of 'an adult male performing oral sex on a prepubescent female.' The report goes on to describe, in detail we will spare readers, what is visible in the picture, as well as details of other examples from the hundreds of pictures Goff had paid for over time.
>
> Children are exploited, molested, and raped for the prurient pleasure of Goff and others who support suppliers of child pornography. These small victims may rank as 'no one else' in Goff's mind, but they do indeed exist outside his mind. Their injuries and the taking of their innocence are all too real. There is nothing 'casual' or theoretical about the scars they will bear from being abused for Goff's advantage. Far from persuading us that Goff's crime was relatively minor, his efforts to downplay the harm his actions have inflicted on others serve chiefly to highlight the concern the District Court should have had with Goff's failure to appreciate the seriousness of his offense."

In short, the severity of child pornography laws reflect the immense social harm caused by Shore's crimes. Indeed, though Shore faces a 15-year mandatory minimum term, the circumstances of his crimes are so egregious that his sentencing Guideline range is calculated at life imprisonment. Yet Shore completely fails to appreciate the magnitude of his offenses. He argues to this Court that "most" of his acts were over Facebook and not in person. Def.Br. at 3.

13

Shore ignores the fact that at 33 years of age, he engaged in sexual intercourse with a child who was just 16 years old, and did so multiple times, over an extended period. His argument also demonstrates his complete lack of understanding of the severity of harm he caused to all of his victims, a harm that is clearly recognized by Congress, the Supreme Court, and every court in the this country. As part of his crimes Shore attempted to have his 6th grade victim sexually abuse her own 9-year old sister; he engaged all of his victims in sexual communications that were more advanced than their years; he had each of them engage in sex acts, record them, and send them to Shore; and for one of those victims, Shore distributed her sexually explicit images – which included photos of her face – over the Internet, ensuring that her exploitation is forever memorialized.

Shore does not in any way address the circumstances underlying his crimes, his multiple victims, his predatory behavior seeking out children to sexually victimize, and the harm he caused to his victims. Instead, he seeks to use the opinions rendered by his defense expert regarding his mental condition as the sole grounds for this Court to find that the mandatory sentence is cruel and unusual punishment[6]. Defendant Shore was diagnosed as being on the Autism Spectrum Disorder (ASD) by his expert, as well as by the BOP expert. However, the BOP expert classified him in Level One, the lowest level of impairment. BOP evaluation at 10. Unlike the defense expert, however, the BOP expert unequivocally stated that Shore's sexual attraction to minors is <u>not</u> due to his ASD. Id at 24; Atkins report at 10.

---

6 Curiously, though his defense expert opined that community treatment is the most appropriate punishment, Shore arbitrarily requests this Court to sentence him to 5 years' incarceration, without any explanation whatsoever as to why this particular length sentence would somehow not be "cruel" or "unusual punishment" for a defendant who claims to be so severely mentally incapacitated.

14

Indeed, the independent evaluation by the Bureau of Prisons expert demonstrates why such stringent criminal laws were enacted for child sex offenders. Shore was found to have significant deviant sexual interest in children and was diagnosed as a pedophile. BOP evaluation at 10, 23. The BOP evaluation also deemed him to be manipulative and deceitful, in terms of getting his minor victims to do what he wanted, and in lying to adults to conceal his crimes. Id. at 20, 24, 25. He has problems with sexual self-regulation, and is prone to acting out, despite his professed feelings of "remorse." Id. at 21, 9. The ultimate opinion of the BOP expert is that defendant Shore poses a high risk for sexual recidivism. Id. at 20, 22.

There is nothing in this records that demonstrates a 15-year mandatory minimum is "grossly disproportionate." Defendant Shore cites to no case that held that mandatory minimum sentences for defendants with ASD are cruel and unusual[7]. To the contrary, the circumstances of this case, which include extensive psychiatric findings by an independent expert who was appointed by the Court, clearly show that a sentence well above the mandatory minimum is required for this manipulative, dangerous, multi-victim child offender. Defendant Shore's sentencing Guideline range has been calculated at life imprisonment, based entirely on the egregious circumstances of his crimes. Defendant Shore has failed to demonstrate gross disproportionality with regard to the mandatory minimum sentence for these horrific crimes, and thereby has failed to meet his burden on this first prong of inquiry. He also ignores Third Circuit precedent as set forth in *MacEwan*. The Court is not required to examine any further. The

---

7 Defendant cites to *United States v. D.W.*, 198 F.Supp. 3d 18 (EDNY 2016) as support for his proposition that mandatory minimum sentences are "increasingly recognized as cruel." Def.Br. at 7. But the Second Circuit in D.W., though critical of mandatory sentences, actually found the 15-year mandatory minimum for child exploitation offenses not to be "grossly disproportionate," and denied the defendant's Eighth Amendment challenge.

Government submits his Motion should be denied.

## V. **CONCLUSION**

For the foregoing reasons and authorities cited, the Government respectfully requests that this Court deny defendant's Motion to Preclude Imposition of the Mandatory Minimum Sentence.

                                          Respectfully submitted,

                                          WILLIAM M. McSWAIN
                                          United States Attorney


                                          /s/ Michelle Rotella
                                          MICHELLE ROTELLA
                                          Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Government's Response to be served by e-filing and e-mail upon counsel for defendant:

Burton Rose, Esquire
barose@baroselaw.com

/s/ Michelle Rotella
MICHELLE ROTELLA
Assistant United States Attorney

Date:  July 20, 2018.