IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| vs. | : | CRIMINAL DOCKET NO. 17-502 |
| MICHAEL SHORE | : | |

TO THE HONORABLE TIMOTHY SAVAGE, JUDGE OF THE SAID COURT:

**DEFENDANT'S SENTENCING MEMORANDUM**

This Defendant has already submitted a motion for the consideration of the District Court which challenges the implementation of a mandatory sentence eof 15 years incarceration as demanded by the Government under 18 U.S. Code § 2251(e). The Defendant's challenge is based upon the Eighth Amendment which forbids cruel and unusual punishments. In this case, the Defendant contends that the mandatory minimum sentence that is at issue here is grossly disproportionate to his criminal conduct. Ewing v. California, 538 U.S. 11, 20 (2003).

In considering such a challenge, the Court considers the gravity of the offense, the harshness of the penalty, the sentences imposed on other like defendants in this jurisdiction and the sentences imposed for commission of similar crimes in other jurisdictions. United States v. Burnett, 773 F. 3d 122, 137 (3rd Cir. 2014).

1

The Court ordered the Government to submit a chart on these issues, which has been supplied to counsel. Only two of the defendants had Asperger's Syndrome (#51 and 54). Their offense conduct was far more grievous than Michael Shore's, including direct sexual abuse of prepubescent children. As a general matter, the defendants in the chart engaged in criminal conduct that was substantially more reprehensible than that which was charged against this defendant.[1]

It must be noted that the Defendant's misconduct with respect to Counts II, IV and VI do not fit within the true purpose of the prohibition against manufacture and attempted manufacture of child pornography under 18 U.S. Code §2251(a). This statute was designed to punish offenders who engage in the manufacture of child pornography for criminal purposes; it was aimed at the production of child pornography, focusing on producers who "confront their victims personally" and then engage in exploitive conduct using these victims to promote child pornography. See United States v. Ruggiero, 791 F. 3d 1281, 1289 (9th Cir. 2015). The legislative history shows that this law was meant to address "the use of children as performers in the production of films and photographs depicting

---

[1] The Defendant notes that the victims in the charges in this case were ages 12, 14, 16 and 15. None of the victims were prepubescent. The females referred to in the Facebook chats were ages 13-16.

sexually explicit conduct". Id. at 1289. Here, the Defendant solicited these young girls to send him explicit photographs for his own gratification and not for the purpose of creating child pornography as a producer or manufacturer.

Furthermore, the Defendant's argument regarding the Eighth Amendment must be considered in light of the harshness and difficulty of the conditions of incarceration that he is likely to encounter. **Rhodes v. Chapman**, 452 U.S. 337, 347 (1981), **Brown v. Plata**, 563 U.S. 493, 510 (2011).

In **United States v. D.W.**, 198 F. Supp. 3d 18 (EDNY 2016), Senior Judge Jack Weinstein wrote that a sentence of long term incarceration can violate the Eighth Amendment if the defendant is a person for whom such imprisonment could result in unacceptably difficult and intolerable conditions. In that case, Judge Weinstein recommended that the defendant serve his sentence at a medical facility that offers specialized treatment in services or otherwise the Court would rule that the sentence would not be constitutionally acceptable under the Eight Amendment 198 F. Supp. 3d at 147.

A key problem in these types of cases is that a defendant such as Michael Shore may end up in solitary confinement in order to protect him from exploitation and harassment by other inmates. Time served in restricted housing units like that can significantly exacerbate the condition of a person who is already suffering

from mental health problems. See "Worse than Death", Alex Kozinski, 125 Yale Law Review 230 (2016).

Like the defendant in D.W., supra, this defendant has characteristics which render him highly vulnerable to abuse during incarceration. An inmate like him, with a long term untreated mental illness, is often placed in solitary confinement, to punish him for his non-conforming behavior and for his own protection. **United States v. Lawrence**, 254 F. Supp. 3d 441, 453 (EDNY 2017).

Furthermore, when the inmate finally finishes his term of incarceration, the negative effects of solitary confinement do not end: "The harm caused is likely to translate into greater risks for the public when a former inmate is unable to re-enter his community even somewhat rehabilitated-the lasting consequence of prolonged isolation." **D.W.**, supra at 93-94.

Accordingly, the Defendant respectfully submits that the prison environment that Michael Shore will be facing "must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society". **United States v. Lawrence**, supra at 453.

Attached hereto is a letter from Dr. Eliot Atkins, prepared at the request of defense counsel, dated May 27, 2020. As the Court can see, Dr. Atkins has observed that the Defendant, if given long term incarceration, is in a position to be

victimized and exploited by other inmates and by staff who do not understand his lack of social cues, his inflexible thinking and his poor comprehension of non-verbal communication. An inmate like this Defendant may be viewed by others as oppositional and willful when in fact his social judgment is compromised by his neurological deficits.

A defendant like this is not able to foresee the consequences of his actions. One of the problems of this case is that the defendant appears to lack empathy and understanding of the consequences of his behavior as to the victims.[2]

What is needed for Michael Shore is treatment and not incarceration. As Dr. Atkins writes, "There is no question that treatment, rather than punishment, is the most efficacious way of reducing recidivism for those with ASD. Incarceration could be especially cruel and dangerous for such individuals" (page 2). Nevertheless, even at FMC Devins, there is no treatment program for ASD

---

[2] The Defendant notes that as to Minor 1, the Government has alleged that the Defendant manipulated and deceived her and her mother. However, the facts of the case show that the Defendant did not seek to engage in sexual contact with Minor 1's younger sister, only that he asked if Minor 1 if she had ever "made out with your sister?". The Defendant did not deceive Minor 1 because he told her that he was 33 years old and did not conceal his identity. The Defendant's behavior with respect to Minor 1 is consistent with a person with ASD who doggedly pursues a goal for which he has become obsessed, to wit, the collection of child pornography. It is also noteworthy that on May 31, 2017, when the Defendant told the agents about this incident, he fully disclosed all of his contact with Minor 1, as well as other females that he had asked for sexually explicit pictures.

5

inmates and only an 18-24 month program for sex offenders, to be provided at the end of the jail term (N.T. 7/31/18, 20).

In the letter sent to the Court by the defendant's parents, Cindy and Joseph Shore, they have outlined their concern over their son's long term welfare should he receive a long term of incarceration. They are hopeful that with proper professional treatment and cognitive behavioral therapy, the defendant will not revert to his former traits and coping mechanisms when finally released. Their anxiety over Michael's present difficulties in incarceration appears to be fully justified.

From May 31, 2017, the date of the defendant's arrest and incarceration, until June 4, 2020, the defendant was seen by a medical or mental health professional 111 times, not counting the visits that took place at FMC Devins. In the reports that have been recently provided to counsel, on over 25 occasions, therapists have stated that the Defendant needed cognitive behavioral therapy, yet no real treatment has taken place.

The FDC report particularly notes that when he was in the special housing unit, it was "difficult for Mr. Shore since it limited his contact with his primary source of social support (his parents)." The report states that Mr. Shore should not have to spend any more time in SHU than is necessary or required due to

safety/disciplinary means because it is so difficult for the defendant to cope with change. Even Dr. Channel from FMC Devins admitted that the Defendant cannot cope with being placed in a restricted housing unit (N.T. 7/31/18, 80, 108).

At the present time, the Defendant is locked down in his cell, like other inmates, for 23 hours a day, which further increases his sense of anxiety. We know from the reports that he suffers from a major depressive disorder. His fear and anxiety over COVID-19 is justified as such cases are increasing in the prison population. Thus the time that Michael Shore has been serving in FDC must be considered "hard time".

As previously submitted to this Court, the Defendant also requests that the Court grant a downward departure and a variance from the applicable sentencing guideline range in view of **United States v. Grober**, 624 F. 3d 592 (3rd Cir. 2010). In that case, the Court of Appeals held that a trial court may vary downward from the guideline range based on policy disagreements with §2G2.2 of the United States Sentencing Guidelines, although a Court is not mandated to do so.

Michael Shore's intellectual and mental disabilities, his amenability to treatment and the remote likelihood of reoffending (if properly treated) support a downward variance from the applicable guideline range, which is grossly disproportionate to the degree of his misconduct.

Furthermore, a downward departure is authorized where the Defendant has the potential or likelihood of victimization in prison. **Koon v. United States**, 518 U.S. 81 (1996); **United States v. Parrish**, 308 F. 3d 1025 (9th Cir. 2002).

## CONCLUSION

Under 18 U.S. Code § 3553(a), the court shall impose a sentence that is "sufficient, but not greater than the necessary", to comply with the purposes set forth in the Act. Among the factors to be considered by the Court are the nature and circumstances of the offense and the history and characteristics of the defendant. In this case, a sentence as suggested by the Presentence Report, based upon Offense Level 43 with a Criminal History category of I, is life in prison (paragraph 164, page 25).

In United States v. Olhovsky, 562 F. 3d 530 (3rd Cir. 2009), the Court vacated a child pornography sentence on direct appeal on the basis that the trial court had failed to consider the individual characteristics of the offender during sentencing, including concerns expressed by the defendant's therapist that the defendant was developmentally immature and would be harmed by a long prison term. Id. at 551. As stated therein, "Revulsion over these crimes cannot blind us as jurists to the individual circumstances of the offenders who commit them."

This is a Defendant who has no history of violence and engaged in no assaultive behavior. He did not lure children under the age of 10 to a lair for sexual gratification. He did not coerce the females to pose in a sadistic or violent manner. He did not trade in child pornography and did not share files with others

over the internet. He was not involved in child sex trafficking and, with one exception, engaged in no physical contact with the victims. His neurological deficit created a vacuum in empathy for the victims. He has spent hard time in the Federal Detention Center since his arrest, receiving only the treatment necessary to keep his situation stable. His ASD and the need of cognitive behavioral therapy are evident. Once he is given proper treatment, he should be released to return to his family, with proper supervision.

For all the reasons expressed herein, your movant Defendant Michael Shore respectfully prays this Honorable Court impose a sentence that is sufficient but not greater than necessary under the circumstances for this case.

Respectfully submitted:<br>
BAR 2021<br>
BURTON A. ROSE, ESQUIRE<br>
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| vs. | : CRIMINAL DOCKET NO. 17-502 |
| | : |
| MICHAEL SHORE | : |

## CERTIFICATE OF SERVICE

COMES NOW, Burton A. Rose, Esquire, Attorney for the Defendant Michael Shore, in the above captioned matter, and hereby respectfully certifies that a true and correct copy of the attached **DEFENDANT'S SENTENCING MEMORANDUM** has been electronically forwarded by the Court's Electronic Case Filing System to:

> Michelle Rotella, Esquire
> Assistant United States Attorney
> 615 Chestnut Street, Suite 1250
> Philadelphia, PA 19106-4476

> Respectfully submitted:
> BAR 2021
> BURTON A. ROSE, ESQUIRE
> Attorney for Defendant

DATED: July 1, 2020

11

# Elliot L. Atkins, Ed.D., P.A.
## Clinical and Forensic Psychology

651 Route 73 North
Suite 105
Marlton, New Jersey 08053

Ph: (856) 983-6151
Fax: (856) 983-3426
elliotatkins@msn.com

May 27, 2020

Burton A. Rose, Esquire
1731 Spring Garden Street
Philadelphia, PA 19130

Re: Michael Shore

Dear Mr. Rose,

I am writing in anticipation of Michael's upcoming sentencing hearing in order to provide you with information that I believe will be helpful to the Court as it considers an appropriate sentence for him. This letter represents a supplement to my September 19, 2017 report of the findings of the forensic psychological evaluation that I had conducted earlier that year. At that time, I diagnosed Michael with Autism Spectrum Disorder (ASD), a condition that had never been properly diagnosed despite multiple evaluations and intensive special education services over the years. Consequently, he was never given effective treatment – treatment designed to address the specific characteristics of this neurological disorder. I feel that it is important for the Court to be aware of the fact that is not too late for appropriate treatment to be provided, as ASD has been found to be amenable to cognitive behavioral therapy. My initial report addressed what I believe were the ways in which Michael's ASD contributed to his offense behavior. I am writing now to bring to the Court's attention the unique challenges confronting such individuals should they be incarcerated.

Since the time of my evaluation, I have had the opportunity to review the presentence investigation report prepared by USPO Leslie Maxwell and to telephonically interview Michael at the FDC on 5/18/2020[1]. Michael spoke to me of his unabating anxiety and referenced the fact that his anxiety medication has been increased on multiple occasions over the past year. He spoke of the interpersonal struggles that he has been experiencing on a regular basis, most particularly the bullying and intimidation he has experienced at the hands of his fellow inmates, that has led him to spend much of his time in his cell. He told me:

> They pick on me constantly; they treat me like I'm an animal; they push my buttons and try to get me to react. I would complain to Dr. Daniels about this. At first, she thought I was egging people on and being disruptive, but it was just me being myself. This is how people react to me.

---

[1] I have requested, but have not yet received, FDC medical records reflecting the psychopharmacological intervention that Michael has been receiving for his diagnosed anxiety disorder.

NJ License Number SI 01785                                    PA License Number PS 002537-L

Michael's account of his interpersonal struggles is certainly not surprising given his diagnosis. The underlying neurobiological differences in ASD individuals are experienced by others as stupidity, immaturity, naivety and social awkwardness. Their rigid, stereotyped thinking and inability to appreciate the perspective of others sets the stage for victimization and exploitation. As their peers were growing in social understanding as they aged, an ASD individual's ability to keep up with, and learn from, social interactions did not develop, creating the differences which result in symptoms such as their poor understanding of nonverbal communication, their limited peer relationships, their inability to understand others' perspectives, their social vulnerability and gullibility, their inflexible thinking, their social passivity, and their black and white thinking. In the process of attempting to create a social life for themselves, they are often rejected and targeted by others who view them as different and who do not understand their way of interacting. Language skills can be well developed, but there may be a problem with turn-taking in conversations. Individuals with ASD can become easily anxious or disorganized in overstimulating or unstructured situations, often leading to actions or verbalizations that may be difficult for those around them to understand or tolerate. It is typical, and most unfortunate, that the behavior of individuals on the spectrum are often seen by others as willful, stubborn or oppositional. Because their underlying social judgment is compromised, their recognition of more complex social communication and occurrences is limited. The reason they had so often been an easy target for schoolmates is precisely because they were not able to foresee the eventual consequences of their actions. These problems would be infinitely greater should an ASD individual be incarcerated. Their impaired social skills lead to their behaviors being misinterpreted by other inmates, as well as staff, resulting in their becoming targets for retaliation.

There is no question that treatment, rather than punishment, is the is the most efficacious way of reducing recidivism for those with ASD. Incarceration could be especially cruel and dangerous for such individuals. As Mahoney (2009) stated in his treatise on Asperger's Syndrome and criminal law:

> Individuals with ASD are likely to be victims in prison. Their failure to interpret or deflect other's manipulations, combined with the social anxiety and inability to defend themselves or effectively manipulate any social encounter, leaves ASD individuals particularly vulnerable. In prison, where domination and manipulation among prisoners plays a pivotal role in inmate survival, a socially fragile individual such as an ASD individual would be an easy target for physical and sexual abuse.

The psychological literature addresses the extent to which ASD inmates could be easily abused, manipulated exploited and controlled and would be at a higher risk to be blackmailed or abused sexually or physically. The prison experience for such individuals can be truly life-threatening. Their inability to fit in and understand the established social order puts them in danger. Neither inmates nor corrections officers would likely be able to tolerate Michael's endless, rigid perseverations about every aspect of daily life. These are not voluntary behaviors, but

neurologically-driven deficits which are exacerbated by the anxiety of a challenging situation such as detention. That is why those on the autism spectrum are often moved to solitary confinement for their own protection. In Michael's case, the isolation has primarily been of his own choosing.

I am hopeful, Mr. Rose, that the above information will be helpful to both you and the Court in your efforts to facilitate an appropriate and humane sentence for Michael Shore. Separate and apart from my concerns regarding the likelihood of Michael being victimized is the fact that appropriate treatment will certainly not be available and his already damaged sense of self will assuredly become further compromised.

Please feel free to reach out to me should you have any questions or should you require any additional information.

Respectfully,

Elliot L. Atkins, Ed.D.
Licensed Psychologist

/ela
Wrd4/shoremichaelrptmay27-20.doc